C. H. STERNBERG & SONS, et al., Plaintiffs Appellants, v. NODAWAY DRAINAGE DISTRICT NO. 2, Defendant, Respondent.

NODAWAY DRAINAGE DISTRICT NO. 2, Plaintiff, Respondent, v. C. H. STERNBERGER & SONS, et al., Defendants, Appellants.

Kansas City Court of Appeals. January 5, 1920.

1. **CONTRACTS: Excavation and Construction of Drainage Ditch According to Plans and Specifications.** The plaintiff contracted to excavate and construct a drainage ditch according to certain plans and specifications which were made a part of the contract. Both plaintiff and defendant knew that the plans contemplated that the banks of the ditch would be too steep to hold, it being the purpose of the defendant to have the banks cave in and the caved in material removed by erosion of the waters of the Nodaway river. *Held*, that under the contract the plaintiff was not required to remove the material which had caved in during the progress of the work because of the steepness of the banks of the ditch.

2. ———: ———: **Substantial Performance.** If, under the above contract, the plaintiff left unexcavated material in the ditch that prevented the waters of the river from flowing into it and eroding the caved-in material, when such waters reached the stage contemplated for the doing of the work of erosion, he is not entitled to recover as he has not substantially performed the contract.

3. ———: ———: **Engineer's Final Estimate: Binding Effect on Drainage Board.** Where the contract provides that in no case will the approval of the engineer in charge of the work done diminish the responsibility of the contractor the engineer had no right to bind the board by final approval.

Appeal from Andrew Circuit Court.—*Hon. Alonzo D. Burnes,* Judge.

REVERSED AND REMANDED.

*McVey & Freet* and *Cook, Cummins & Dawson* for appellants.

*A. F. Harvey* and *Shinabarger, Blagg & Ellison* for respondent.

BLAND, J.—Plaintiffs, C. H. Sternberg & Sons et al., hereinafter called the contractors, on December 11, 1913, filed a petition in the circuit court of Nodaway County, Missouri, praying judgment in the first count in the sum of $5101.93, the claimed balance due on a contract for the grading of a drainage ditch, entered into by plaintiffs with Nodaway Drainage District No. 2, hereinafter called the drainage district. The drainage district on December 13, 1913, filed suit against C. H. Sternberg & Sons, the surety on their bond, et al, in said court alleging the failure on the part of the contractors to properly complete the drainage ditch, and asking judgment for damages for such failure in the sum of $6898.07. The suits on changes of venue were sent to the circuit court of Andrew County where they were consolidated and a referee appointed. The court set aside the findings of the referee and rendered judgment against plaintiffs on their first count and found in favor of the drainage district in the sum of $4079.92. This latter sum being less than the amount the contractors would have been entitled to, to-wit, the sum of $5101.93, had they properly completed their contract, which the court found they had not done, the court found that the drainage district was not entitled to a judgment for said sum of $4079.92. The contractors have appealed.

The facts show that on Oct. 27, 1910, the contractors entered into a written contract with the drainage district for the construction of a drainage ditch according

to certain plans and specifications. The object and pur-
pose of the contract was the excavation of a drainage
ditch, approximately 16 miles in length from north to
south, in the valley of the Nodaway river. The dimen-
sions of the ditch were to be 18 ft. in width at the
bottom with a side slope of 1/4 ft. horizontal to 1 ft.
vertical. The ditch was to be excavated in depth accord-
ing to the grade line shown in the profile prepared by
the engineer of the Drainage Board. The ditch ran
through a comparatively level river bottom. It had a
fall of 2 or 3 feet to the mile and had an average depth
of 16 feet with extremes of from 10 to 25 feet. The
average width at the top was to be from 16 to 28 feet.
The ditch intersected or returned to the Nodaway river
twelve times. The river thus divided the ditch into
sections which were numbered consecutively 1 to 13,
beginning with the north end. This appeal is concerned
with the facts concerning sections 1, 2, 3, 5 and 12 only.
The wasted earth to be excavated was to be piled on the
bank of the ditch 8 feet from the edge thereof. This
wasted earth is called the spoil bank. The Board's en-
gineer was to set stakes and levels indicating the ex-
cavating to be done. The contractors were to receive
$.0645 per cubic yard for the excavating, and the
specifications provided that the excavation should be
measured in position before the work was done or sub-
sequently measured as the cubic contents of the excava-
tion made. The excavation was to be done by a dredge
boat where possible.

There was a railroad bridge across the Nodaway
river where section 3 of the drainage ditch began. Owing
to the difficulty of getting a dredge boat under this
bridge, sections 1 and 2 of the ditch, which were north
of the bridge, were dug with a drag line dredge. A drag
line dredge is a steam shovel machine rolling on rollers
or wheels and working on top of the bank and placed on
the side of the ditch it is excavating. This machine
began at the lower end of the ditch and worked up
grade, the ditch remaining dry and free from water

until the machine should emerge into the stream at the upper end of the section.

When the drag line dredge reached the north end of section 1 there was some dirt left at the entrance of the section, and about 150 feet at the extreme north end of section 2 was left unexcavated to a depth of six or seven feet. The remaining 11 sections of the ditch were excavated with a dredge boat that started south of the railroad bridge at the north end, or the beginning, of section 3. The dredge boat worked down grade and the waters of the Nodaway rivers were supposed to follow after it and keep it afloat. It was necessary to build a dam across the head, or beginning, of the section the boat was excavating and to pump water into it to a high enough level to float the boat and to enable it to do the work. The work of excavating was done during the years of 1911, 1912, and the first half of 1913.

The contract entered into for the construction of the ditch provided that the contractors should excavate and construct the drainage ditch in accordance with the plan for drainage adopted by the Board; that it should be constructed and the excavation completed in all respects and in every particular as provided by said plan for said drainage; and that the contractors should fully complete the drainage ditch between the points specified. The plan for the drainage recited that the ditch was being constructed to drain and reclaim lands in the district and to protect them from overflow and damage by flood and water. It described the dimensions of the ditch to be constructed. The specifications provided that its object was the doing of all excavation and removal of all obstructions and the performance of all work required to furnish a completely graded ditch; that the ditch should be completed in a first-class workmanlike manner according to the "plan for the drainage' and the plans and specifications.

The evidence shows that the character of the earth through which the ditch was excavated was a sandy loam which had a tendency to cave. The evidence further

shows that to prevent the sides of the ditch from caving its banks should have had a slope of 1. ft to 1 ft. instead of a slope of 1/4 ft. to 1 ft. as provided in the plan. The Board's engineer advised the Board that the slope of 1/4 ft. to 1 ft. was not a proper one and that the banks of the ditch would cave. The contractors advised the Board to the same effect. The members of the Board testified that they knew the banks would cave; that it was their purpose to have the banks cave and the ditch thus made wider, and that it was their idea that when the Nodaway river should rise to the proper stage water would flow into the ditch when finished and erode or wash out any caved-in material that might be present. There is only one inference from the evidence and that is that the drainage board was actuated by a motive of economy in constructing the ditch. The board desired a much wider ditch than it contracted with the contractors to build, believing that it would acquire such wider ditch by means of erosion rather than by paying the contractors the additional amount of money necessary to have the ditch constructed to the width actually desired.

The court found that it was the desire of the drainage district Board that the banks should cave and that the banks did cave badly and at times immediately behind the dredge boat, and that cave-in material filled the ditch to a depth of from six to eight feet in some places. The evidence shows that instead of the ditch being of the width of 29 ft. at the top, the width the contractors attempted to make it, it caved in at some places enough to make the width at the top as much as from 80 to 100 feet, and at places even a portion of the spoil bank caved into the ditch. The court found that the plans for the drainage ditch were defective but that notwithstanding this fact and the fact that it was contemplated by the drainage Board that the banks of the ditch would cave, and that it did cave to the extent of nearly 72,442 cubic yards of earth, the contractors were required to remove said caved in earth and deliver to

the drainage district a completed ditch free from all caved in material.

We think that the court was in error in its ruling on this point. , While the contract plans and specifications provide that the contractors were to do the excavating and were required to furnish a completed ditch, a proper construction of the contract arises on the whole subject-matter, the parties in their relation to each other, the object to be subserved by the contract as well as the language used therein. The contractors were to be paid $.0645 per cubic yard for an excavated ditch, the dimensions of which were fixed in advance. The Board's engineer was to set stakes and levels and the excavation was to be measured in position before the work was done or subsequently measured as the cubic contents of the excavation made. The drainage district is claiming that under the terms of the contract the contractors should be paid only for the amount of excavation made between the stakes as set by the engineer, but should there be any caved-in material that such caved-in material, if it caved in before the work was completed and accepted by the Board, should also be excavated by the contractors without any additional pay therefor.

There is nothing in the contract by which the contractors agreed to maintain the ditch for any length of time nor did they guarantee that the banks of the ditch would remain in the same condition that they were required to be excavated by the terms of the contract and specifications. On the other hand, the drainage Board was warned that the banks would not remain in such condition and with full knowledge of the situation they deliberately planned the work so that the banks would cave and that the caved in material would be removed by process of erosion instead of by the contractors. It would seem against common experience if not common sense that the contractors would undertake to construct a ditch at so much a cubic yard for the portion that they were to construct and take the chance

of removing a great volume of unknown caved-in material that might result by reason of the banks being too steep. We think it is apparent that the contractors not only did not agree to do this but that the Board did not contemplate that they should do it, for the reason that it is uncontradicted that it was the purpose of the Board to have the caved-in material removed by some agency other than by the work of the contractors.

The drainage district cites cases to the effect that the contractors were bound to construct the work according to the specifications even though such specifications might have been defective, for the reason that they knew at the time they accepted the work that the specifications were defective and agreed without reservation to do the work. We think that this case is unlike those cases and is even unlike the extreme case of Lonergan v. San Antonio Loan & Trust Co., 104 S. W. 1061 (Tex.), cited by the district. In that case a building was being erected by contractors but by reason of faulty specifications it fell when nearly completed. The court held that the contractors were required to complete the building regardless of defective specifications. The decision was based on the ground that the persons having the house built had employed a competent architect to draw the plans and specifications; that they were submitted to the bidders for inspection and for their own determination as to whether or not they were willing to bind themselves to build the house in pursuance of and in accordance with the specifications as prepared. It was held that the contractors were called upon to exercise their own judgment in reference to whether they could build the house according to specifications and as there was no negligence shown on the part of those building the house, the contractor was required to complete it, even though it fell on account of defective specifications. The case at bar is unlike that one, for the reason that it was not the purpose of the builders of the house in the Lonergan case that the house should fall but it was their expectation that it would not, and

they were not guilty of any negligence in relying upon a competent architect to plan a house that would not fall, while in this case it was the purpose and intention of the Board of Directors of the Drainage District to have the banks of the ditch fall.

On March 29, 1913, the Board of Directors of the drainage district held a meeting in which an agent of the contractors was present. At that time the Board passed a resolution to the effect that the contractors had not finished the work. During the three and a half months following this meeting the contractors had the dams in sections 3, 5, and 12, and the unexcavated material at the north end of sections 1 and 2, dynamited and some work done by hand upon said dams and unexcavated material. After this work was done, the contractors claimed that they had fully completed their contract and had excavated all the material they were required by the plans and specifications to do, and that nothing remained in the ditch except the caved-in material. There was evidence supporting this claim of the cotractors and on the part of the drainage district Board there was evidence to show that said dynamite and work did not clear the ditch as claimed by the contractors. The court made findings covering this point which findings are inconsistent and contradictory. In its finding of fact No. 1, as requested by the drainage district, the court found a total of 72,442 cubic yards of material in the drainage ditch. In that finding the court found that a portion of this unexcavated material was dirt that had never been dug at the head of the north end of sections 1, 2, and 3, and that said 72,442 cubic yards of material remained in the ditch for the reason, in part at least, that the contractors had failed to completely remove the dams across the north end of sections 5 and 12. In the court's declaration of law No. 1, given on the part of the drainage district, a similar finding was made.

In the court's finding of fact No. 7, given on its own motion, the court found that the "dams were removed by the contractors by dynamiting and shoveling."

In finding No. 10, given on its own motion, the court found that "the north end of section 3 is greatly wider than the contract dimensions and was so when the contract was finished in January, 1913." In finding No. 11, given by the court on its own motion, the court found that the channel of the ditch was obstructed by material caved in from the banks of the ditch, "and that as a result" of the caving in of the material "the channel of the ditch was obstructed and the waters of the river were prevented thereby from flowing through the ditch." In finding No. 6, given by the court, the court found that the 72,442 cibuc yards of earth that should be taken out before the ditch would be down to grade, *"was dirt caved in from the banks,"* and immediately following and in the same finding the court said "on the other hand finds that a *large portion* of such yardage was the result of the caving in of the banks of the ditch, occasioned by the too steep slope of the banks arising from the plans adopted by the Drainage District." (*Italics ours.*)

While the issues in this case are comparatively simple there were fifty-one findings of fact and declarations of law given and refused. This may account in some degree for the great conflict in the findings of the court. As we view it there is but one issue to be determined in this case, which may be stated as follows:

The plan of the drainage Board contemplated that the banks of the ditch should be too steep to hold. It was their purpose to have the same cave-in and the caved-in material should be removed by erosion or the waters of the Nodaway river; that the contractors knew of this plan when the contract was let; that the contractors were under no obligaion to remove the caved-in material; that they were under obligation to substantially perform the contract by excavating the ditch substantially as called for in the plain and specifications; that if they left dams or unexcavated material at the heads of sections 1, 2, 3, 5, and 12 that prevented the waters of the Nodaway river from flowing into the ditch and erod-

ing the caved-in material, when such waters reached the stage contemplated for the doing of the work of erosion, then the contractors, as they sued on the theory of substantial compliance of the contract, are not entitled to recover. On the other hand, whether the plan and specifications were faulty or not, the contractors were required to substantially perform their contract for the digging of the ditch and if the waters of the Nodaway river could not erode the caved-in material when these waters reached the contemplated stage for the work of erosion, even had the contractors excavated the ditch and removed all the dams and unexcavated material, then the contractors cannot recover unless they substantially performed their part of the contract, that is, substantially removed the obstructions last mentioned.

On account of the conflicting findings of the court on the question as to whether the contractors had done their work by removing the dams and unexcavated material, the case must be reversed and remanded, but as it must be retired it is necessary for us to pass upon the question as to whether the so-called final estimate of the Board's engineer was binding upon the Board as an acceptance of the work, properly done and completed in accordance with the plan and specifications.

On October 26, 1913, the Board's engineer wrote to the contractors in answer to a letter from them, giving facts and figures as to the actual yardage in the cross sections of the ditch for which they were to receive pay if the ditch was completed fully to the grade line.

"Mr. E. G. Sternberg.

Kansas City, Mo.

Dear Mr. Sternberg:

Enclosed please find Final Estimate of Nodaway river from Stake O to South end at Quitman.

Actual yardage ............... 881,400.93 Cu Yd.
Extra at Station 266 (Clary
       land) .................... 2,427.70 Cu Yd.

Extra at Quitman sand bar .... 1,222.97 Cu Yd.

Total yardage ........... 885,051.60 Cu Yd.

I will go over this again and if I find any error will notify you. Rec'd your letter of 24inst. with thanks.''

The court found as a fact that this amount of earth was actually excavated by the contractors.

It is claimed that this so-called estimate, together with the periodical estimates of the dirt excavated by the contractors given by the Board's engineer, bound the Board not only as to the amount of material excavated but as to the performance of the work according to the contract. The court gave these estimates the effect of being binding only as to the amount of material excavated. We think that it was right in so doing. While the specifications provide that—

''The Nodaway Drainage District No. 2 will employ an efficient supervising engineer, whose business it shall be to give all lines, stakes, levels, datum points, bases and foundations. It will also be his business to verify the correctness of the contractors' work, and his decision on this point shall be final.''

It also provides that—

''And in no case will the approval of the Engineer in charge of the work done diminish the responsibility of the contractor, if subsequent use shall prove the work to be defective or not according to the specifications or the 'Plan for Drainage' of said District.''

and,—

''Payment will be made by said Drainage District upon the certification of their Engineer in charge at the end of each month. 10 per cent. of his valuation of the work done is to be reserved unntil the final completion of the contract. If it is deemed necessary the Drainage District shall have the right to withhold this ten per cent. for sixty days after the completion of the work and until the same is completed in a first class and workmanlike manner according to the 'Plan for Drainage' and the plans and specifications, and said District

shall have the right to apply any portion thereof that may be required to complete said work in said manner, and the approval of the supervising Engineer will not relieve the contractor of full responsibility for sixty days from the date of the completion of the work under this contract.''

It is apparent from a reading of the contract as a whole that the engineer had no right to bind the Board as to any matter except as to the amount of the excavation. The contract nowhere calls for a final estimate and if the letter of the engineer of October 27, 1913, can be construed as a final estimate accepting the work as completed according to the contract, plans and specifications, then his act in attempting to approve the work was clearly void, as an act not authorized by the terms of the contract.

The judgment is reversed and the case remanded. All concur.